In the Matter of the White Star Bus Line, Inc., etc. Jaime Ortiz et al., Appellants.

No. 7770.   Argued July 11, 1938.—Decided July 26, 1938.

*Juan Valldejuli Rodríguez* for appellants.   *C. Iriarte, F. Fernández Cuyar* and *H. González Blanes* for White Star Bus Line, Inc.

Mr. Justice Wolf delivered the opinion of the court.

This was ·an advanced hearing on an appeal by Jaime Ortiz, Alejandro Salgado, Juan González and others from a decision of the District Court of San Juan sustaining the validity of a certain order of the Public Service Commission.

The appellee or intervener, the White Star Bus Line, Inc., filed a motion to dismiss the appeal as frivolous. We overruled the motion to dismiss in the opinion which must be considered in connection with the decision we are now making. There we said:

" . . . These considerations would dispose of the appeal which then could be considered frivolous were it not for the fact that there is another doubt suggested by the appellants.

"It is this, that section 38 of the Organic Act, supra, would seem to apply exclusively to public carriers or common carriers. Throughout this part of the Organic Act it is evident that Congress had in mind companies or probably persons who were such public carriers. Of course, the framers of the Organic Act of 1917 may not have had in mind the smaller automobiles with seats for a very limited number of passengers. Nevertheless, the general tendency of the Organic Act, we think, is limited to public service corporations.

"Then the question arises whether the Legislature of Puerto Rico could, by an attempted definition, make the appellants public-service companies, if by the well understood customs and practices of motor vehicles carrying passengers they were not so."

We had the doubt whether in Puerto Rico the so-called *"velloneros"* which frequently were in origin private automobiles were or could be considered public carriers. Nominally, under a special theory perhaps, they called themselves such public carriers (*porteadores públicos*) and in various writings, filed in connection with this case, they so styled themselves.

If these vehicles, the object of this suit, are to be considered as jitneys, then there is an unlimited amount of authorities in the United States to show that they are public carriers, e. g.:

*Nolen* v. *Reichman*, 225 Fed. 812, 42 A.L.R. 854; *Rathbun* v. *Ocean Accident & Guarantee Corp.*, 299 Ill. 562, 132 N.E. 754; Pond on Public Utilities, Vol. 3, Sec. 807 *et seq.* See also *Goldsworthy* v. *Public Service Commission*, 141 Md. 674, 119 Atl. 693, and other cases cited in the brief of the White Star Bus Line, Inc.

588

We quote from Pond on "Public Utilities" p. 1527, par. 761:

"Jitneys as common carriers.—The advent of the jitney created an entirely new condition of local transportation and gave rise to many novel and perplexing questions of local control. This means of transportation constitutes an entirely new and different form of common carrier and it may be so classified for regulation. Jitneys whether operating within or between municipalities constitute an extraordinary use of the streets and highways and their operation, being a privilege and not a right, is subject to regulation and control by the state directly or by the municipality acting under authority of the state. Their operation in the streets and highways as common carriers for profit is a special use, which tends to obstruct traffic, and this use with the consequent wear and tear on public thoroughfares is a proper subject for regulation. The entering of the jitney into the field necessitated special regulation, and in the meantime many cities have passed ordinances for that purpose, and their right to do so has been uniformly upheld. Aside from the reasonableness of the provisions of such ordinances the right to classify jitneys and to regulate them as a special class is recognized in all jurisdictions."

Also the following is germane and shows the origin of the name:

"Some years ago the prevalence of small and cheap automobiles gave opportunity for a custom which spread over the country like a prairie fire of the owners of these machines offering for a small fare to transport the public short distances in our crowded cities. Mechanics and small business men made enough in this way going to and from their places of business to pay for running the cars as the public eagerly embraced the opportunity of riding more comfortably and quickly than they could do in street cars. The name 'jitneys' was applied to them as that was the local name in the West of the small coin which was the usual fare charged. The movement threatened for a time to bankrupt all the street railways in the country and for this reason and for the protection of the public in other ways drastic regulations governing these vehicles were soon enacted, which were fiercely attacked and therefore a considerable body of precedents concerning them has arisen." (Babbit-The Law App. to Motor Vehicles, p. 124, par. 188).

Therefore, in this connection it remains to be decided whether these *"velloneros"* may be considered as jitneys. We have not the same number of authorities at hand to show that an automobile operated as these *"velloneros"* are, should be considered as a jitney, but we think that such is the universal understanding in the United States, as indicated by the authorities cited herein. For example, Mr. Pond goes on to say in paragraph 762:

"The reason for distinguishing between a street car system, operating on permanent steel tracks under a special franchise, which requires making large permanent investments, and a Ford touring car, operated as a jitney bus, is quite obvious. . . . "

These *"velloneros,"* except that they are of smaller size, operate exactly like omnibus and other recognized public carriers. A Ford touring car which takes on passengers indiscriminately at any or all points is a small omnibus. That it may not ordinarily be so called does not change its legal situation as a public carrier.

A public carrier of passengers may be defined as one who undertakes, as a business for hire or reward, to carry all or practically all persons who apply for transportation. 10 C.J. 606 *et seq.*, 643 *et seq.* As a matter of law and as a consequence of the position assumed by them we have no question that appellants are public carriers.

Jitneys that use the public streets to take on practically all passengers who apply are such public carriers.

In 1850, in Pennsylvania, it was enacted as follows:

". . . . 'That the select and common councils of the city of Philadelphia shall have authority, by ordinance or ordinances, to provide for the proper regulation of omnibuses, or vehicles in the nature thereof; and to this end it shall be lawful for the said councils, etc., to provide for the issuing of licenses to such and so many persons as may apply to keep and use omnibuses, or vehicles in the nature thereof, and to charge a reasonable annual or other sum therefor.' " *Frankford etc. Railway Co.* v. *Philadelphia,* 98 Am. Dec. 242, 246.

The Supreme Court of Pennsylvania said:

" . . . . This· act is still in force. It plainly authorizes regulation by the issue of licenses. And we are of opinion that it applies to passenger railway cars. They are omnibuses, or, if not, they are vehicles in the nature of omnibuses. They are opened to all, intended for all." *Frankford etc. Railway Co.* v. *Philadelphia, supra.*

Thus, it would appear that the forerunners of railway cars were omnibuses, unquestionably recognized as common carriers.

The necessity for regulation of vehicles that use the streets is almost self-apparent and wa make the following citation:

"A 'jitney' has been defined as 'a self-propelled vehicle, other than a street car, traversing the public streets between certain definite points or termini, and as a common carrier conveying passengers at a five cent or some small fare, between such termini or intermediate points, and so held out, advertised and announced.' And in some regulations relative to jitneys, they are classed and defined as common carriers of passengers. And, in some jurisdictions, regulations governing the use of jitneys expressly define a jitney as a common carrier of passengers. It has been classed as a public utility. A motor bus or a jitney is clearly a common carrier of passengers, within the meaning of that term already defined. Most states have given public utility commissions certain powers over the operation of jitneys, including the power to require a special license or certificate of public convenience or necessity." Huddy's Cyclopedia of Automobile Law, Ninth Edition, Volume 1–2, pp. 299, 300, Sec. 116.

The emphasis of the appellants both at the original hearing and on the final appeal was that these *"velloneros"* had already obtained public licenses from the People of Puerto Rico and had paid $30.00 therefor. This license is a very general one and naturally will enable the *"velloneros"* to do anything that they choose, within reason, if not restrained by the Public Service Commission, as here. The possible field of operation of these *"velloneros"* is not annulled, but possibly limited and, as the intervener insists,

some of them or all of them might operate as jitney buses if they obtain permission from the Public Service Commission.

Therefore, the case of *Smith* v. *Cahoon*, 283 U.S. 553, cited in our opinion of July 5, 1938, with reference to private carriers, has no application.

The appellants at a public hearing before us complained bitterly that they were given no opportunity to be heard before the Public Service Commission. How open the sessions of the Public Service Commission are, we do not know, but we think there is a fair possibility that the appellants or others like them, would have had an opportunity if they so desired. In any event, the Public Service Commission is for most purposes, including the present one, an administrative body or partakes of a quasi legislative character, like municipal assemblies and committees of the Legislature. In this particular case, the nature of these *"velloneros"* was totally well known to everybody, and as to the facts, the Public Service Commission needed no enlightment. That the attitude of the commission might have been changed by an argument of the lawyers is a possibility, but such an opportunity has now been fully afforded by the hearings in the lower court and in this court.

We have also before us an application for the explanation of our order with respect to the bond to be furnished by appellants. There is no necessity for a further bond now.

The decision appealed from should be affirmed.